UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

UNITED STATES OF AMERICA,           :
                                    :   NO. 1:02-CV-00874
     Plaintiff,                     :
                                    :   **OPINION AND ORDER**
                                    :
     v.                             :
                                    :
                                    :
SEVENTY THOUSAND ONE HUNDRED         :
FIFTY DOLLARS IN UNITED STATES      :
CURRENCY ($70,150.00), et al.,      :
                                    :
     Defendants.                    :
                                    :

          This matter is before the Court on Plaintiff's Motion for
Summary Judgment (doc. 52), Claimant Nico Capurro's Motion to
Strike (doc. 53), Claimant's Memorandum in Opposition to
Plaintiff's Motion for Summary Judgment (doc. 54), Plaintiff's
Reply thereto (doc. 55), Plaintiff's Response to Claimant's Motion
to Strike (doc. 57) and notice by Plaintiff of errata to its
response to Claimant's Motion to Strike (doc. 58). For the reasons
stated herein, the Court GRANTS Plaintiff's Motion for Summary
Judgment (doc. 52) and DENIES Claimant's Motion to Strike (doc.
53).

**I. Background**

          This is a civil forfeiture action in which the United
States of America ("Plaintiff" or the "Government") is moving for
summary judgment against the claimed ownership interest of Claimant

Nico Cappuro ("Claimant") in the following property:

> 1) Defendant 1: $70,150.00 in United States Currency;
>
> 2) Defendant 3: the contents of Huntington National Bank Premier Savings Account, number xxx1815 (the "Huntington Account") (doc. 52).

Defendants 1 and 3 are the only remaining defendants in this action, which has been ongoing since 2002 (Id.). This case arises out of an investigation into the unlawful dispensation of prescription pharmaceutical drugs and the indictments and plea agreements resulting therefrom (Id.). Claimant, a physician who worked out of various pain clinics in Southeastern Ohio, pleaded guilty in 2006 to unlawful structuring transactions with the cash proceeds he obtained while serving as attending physician at the pain clinics (Id.) In the statement of facts accompanying the plea agreement Claimant admitted to working for and with William Jewell ("Jewell") and to being the attending physician at the Medical Rehabilitation Center (the "MRC") (Id.). At these pain clinics, like the MRC, every patient routinely obtained prescriptions for hydrocodone (Lorcet) and alprazolam (Xanax), both controlled substances, for a cash payment of $200 or $250 per patient (Id.). Each cash payment received by the MRC was placed in a separate envelope marked with the patient's name on the outside of the envelope (Id.).

Jewell would evenly split the cash payments received at

each pain clinic daily with the attending physician for that day, and Claimant worked 2-3 days per week for Jewell as an attending physician at one of his various clinics (Id.). Claimant's colleague, Dr. Gregory Ebner ("Ebner"), described a similar payment system in his plea agreement, noting that he would ordinarily work 2-3 days per week as an attending physician for Jewell in one of his various clinics and that Claimant would work the other days of the week (Id.). After his association with Jewell ended, Claimant opened and operated the MRC, which was open for six weeks, and no evidence indicates that he split the proceeds from the MRC with any other physician (Id.).

Apparently, the procedure for every patient at these clinics was the same: patients received the same prescriptions for the same payment regardless of the presenting complaint; no referrals for physical therapy or blood tests were given; no vital signs were taken; no medical equipment was present in the clinics, and therefore none was used; no nursing or other medically trained support staff was present; and Claimant, when he was the attending physician, spent approximately two-three minutes with each patient (Id.). Patients were asked to bring a copy of an MRI or an x-ray (Id.). In his briefing, Claimant alleges that he conducted a musculoskeletal examination on patients, that he monitored patients' compliance with the dosages prescribed, that he paid "special attention" to those patients at risk for misuse of the

prescribed drugs, and that he attempted to keep accurate and complete records for each patient (doc. 54). The doctors did not see patients for subsequent visits; instead, as long as pain had at one point been elicited, Claimant would write or call in prescriptions for the patient "forever" (doc. 52).

Some local pharmacies refused to fill prescriptions written by Claimant, and the clinics routinely referred patients to one particular pharmacy in Kentucky, where patients could expect to have their prescriptions filled without questions (Id., doc. 55). The clinics operated on a cash-only basis (doc. 52). At each of these clinics, long lines of patients would form, filling the parking lots and attracting the attention of local law enforcement because of complaints lodged by members of the public (Id.). At least one of the clinics employed an armed security guard for crowd control, and Claimant kept a handgun in his desk at the MRC (Id.).

In 2002, the FBI conducted a search of the MRC as part of its investigation into the prescription drug dispensation occurring there (Id.). The FBI seized, inter alia, $12,800 in cash found in a safe in 64 separate envelopes, each containing $200 and with a different name written on the outside of each envelope and $3,110 in cash found in 22 separate envelopes in a truck parked at the MRC and belonging to an employee, Stanley L. Baxter ("Baxter") (Id.). During that search of the MRC, Claimant told the FBI that there was additional cash, up to $40,000, in a shoe box under his bed at home

(Id.).  According to Claimant's wife, Claimant called her that day and, as a result of that call, she took the money out of the house in a box and put it in the trunk of Claimant's brother's car (Id.). Upon searching Claimant's residence, the FBI seized, inter alia, $1,200 in cash found on the floor of Claimant's bedroom under his bed in six separate envelopes, each containing $200 in cash, with a different name written on the outside of each envelope; over 700 pre-stamped prescriptions for Lorcet along with $68,950 in cash found in a shoe box in the trunk of Claimant's brother's car; and a bank statement for the Huntington Account for the quarter ending December 31, 2001, reflecting a balance in the account in excess of $43,000 (Id.).

Defendant 1 consists of (i) $1,200 in cash found under the master bed in Claimant's home in six envelopes, with patient names written on the outside, containing $200 each plus (ii) $68,950 in cash found inside the shoe box (Id.).  Defendant 3 consists of the contents of the Huntington Account, which was opened in June 2001 with a check drawn on Ameritrade account xxx5167, an account which Claimant admitted in his Plea Agreement he used to structure funds (Id.).

Claimant filed a claim to Defendants on December 3, 2002 (doc. 3), the only person to have done so (doc. 52), and argues that Defendants are the result of legitimate sources of income and therefore not subject to forfeiture (doc. 54).  Claimant has worked

seasonally at River Downs since 1960 and earned, as of the date of the motions before the Court, $200 per day (doc. 55). In September 2001, River Downs paid Claimant $21,000 for the 2001 season and gave him a reimbursement check for $350 (Id.). For thirty-seven years, Claimant also worked as the coroner for Clermont County, for which he was paid a full-time salary of $110,000 (Id.). This salary was deposited directly into a bank account that is not implicated by this action (Id.). In addition, Claimant's wife works two days per week at a nursing home, and she earns approximately $800 per month (Id.).

## II. Motion to Strike

As an initial matter, Claimant moves the Court to strike from the Government's summary judgment motion the statements from Jewell, Ebner, Miranda Perry and Baxter, which Claimant argues do not fit into any legally recognized exception to the hearsay rule (doc. 53). Further, Claimant argues that the declaration of FBI Special Agent C.J. Friehofer contains statements of co-conspirators, confidential witnesses and undercover agents, which should all be stricken from the record (Id.). In the alternative, the Court should strike Agent Friehofer's entire Declaration, as, Claimant argues, it is too tainted with hearsay to have any evidentiary value (Id.).

In response, the Government first contends that the statements of Jewell and Ebner are not hearsay because they are

statements made in court while each declarant was under oath (doc. 57). Under the Federal Rules of Evidence, hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). The Government misapprehends the qualifier "other than one made by the declarant while testifying at the trial or hearing." This qualifier does not mean, as the Government reads it, that any statement made by the declarant at any trial or hearing is excepted. Instead, it means that statements made by the declarant at "the [current] trial or hearing" at issue are excepted from hearsay. It is from this qualifier that we get the maxim that hearsay is an out-of-court statement--it is a statement made by the declarant not during the current court proceedings.[1] Certainly, if Jewell and Ebner were making these statements at the trial or hearing on Defendants' forfeiture, the Government's argument would carry the day. However, the statements are instead being submitted for the purposes of summary judgment. The out-of-court statements of

---

[1] To read the rule as the Government does would, e.g., obviate Rule 804(b)(1), which, inter alia, excepts from hearsay now-unavailable witness testimony given at a different proceeding "if the party against whom the testimony is now offered...had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Fed.R.Evid. 804(b)(1). Reading the Rules as a whole, as the Court must, precludes agreement with the Government's position. See United States v. Morton, 467 U.S. 828 (1984)(statutes are to be read as a whole, not phrases in isolation).

Jewell and Ebner, made during their sentencing hearings, offered for the truth of the matters asserted therein, are hearsay.

However, the Court's inquiry does not end there. The Government's second argument is that even if the statements are hearsay, they fall within the public records and reports exception to hearsay, Federal Rule of Evidence 803(8), because the "docket sheets and pleadings are public record" (doc. 57).[2] The Court agrees that 803(8) is an applicable exception here. Federal Rule of Evidence 803(8) provides in relevant part that "in civil actions ..., factual findings resulting from an investigation made pursuant to authority granted by law [are not excluded as hearsay], unless the sources of information or other circumstances indicate lack of trustworthiness." Fed.R.Evid. 803(8)(C). Notably, there is no requirement that the person charged with making the "factual findings" have personal knowledge of the incident; it is enough that the report "embody the results of [his] investigation...." Combs v. Wilkinson, 315 F.3d 548, 555-56 (6th Cir. 2002) (quoting 2 McCormick on Evidence § 296 (5th ed. 1999)). Here, the statements of fact accompanying the plea agreements were compiled by officers of the court after investigations of the crimes pleaded

---

[2] Claimant argued in his Motion to Strike that the only applicable exception here is 801(d)(2)(E), which excepts from the hearsay rule statements of co-conspirators made during the course and in furtherance of the conspiracy (doc. 53). Because the Court finds that the statements are admissible under a different rule, it need not reach Claimant's arguments.

to, and the facts were admitted to under oath in court. The burden is on Claimant to show that the statements of fact contained in the plea agreements are untrustworthy, and he has not carried that burden. See United States v. Garland, 991 F.2d 328, 335 (6th Cir. 2002). Consequently, the Court finds that the Ebner and Jewell plea agreements and accompanying statements of fact, being trustworthy, are admissible public records or reports pursuant to Federal Rule of Evidence 803(8).

In the alternative, the statements of Jewell and Ebner may be admitted pursuant to 803(22) of the Federal Rules of Evidence, which excepts from the hearsay exclusion rules "[e]vidence of a final judgment, entered after a trial or upon a plea of guilty ..., adjudging a person guilty [of a felony], to prove any fact essential to sustain the judgment...." See, e.g., First Nat'l Bank of Louisville v. Lustig, 96 F.3d 1554, 1574 (5th Cir. 1996)(guilty plea admitted against insurance company); Scholes v. Lehmann, 56 F.3d 750, 762 (7th Cir.)(admissions in guilty plea agreement of Ponzi scheme principal admissible under Rule 803(22) in civil action against persons other than principal); RSBI Aerospace, Inc. v. Affiliated FM Ins. Co., 49 F.3d 399, 403 (8th Cir. 1995) (guilty plea of employee admissible against employer); Rozier v. Ford Motor Co., 573 F.2d 1332, 1347 (5th Cir. 1978) (guilty plea of driver of automobile that impacted with plaintiff's husband's car not "excluded by the hearsay rule by virtue of Rule

803(22)" when offered against Ford in product liability suit);
Semler v. Psychiatric Inst. of Washington, D.C., 538 F.2d 121, 127
(4th Cir.) (in suit against psychiatrist and psychiatric institute
based on patient's murder of plaintiff's daughter, evidence of
patient's murder conviction and confession admissible under Rule
803(22)); Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv.
Fund, Ltd.), 2007 WL 4440360, at *8 (S.D.N.Y. Dec.17, 2007) ("the
criminal information to which [principal of a hedge fund] pled
guilty" was recognized as "ample support in the record [to
establish the] characterization" of a Ponzi scheme in subsequent
proceeding).   Here, the plea agreements and the accompanying
statements of fact go to the essential fact of unlawful drug
trafficking, which is necessary to support forfeiture of
Defendants.   The Court therefore finds the statements to be
admissible hearsay under either 803(8) or 803(22) of the Federal
Rules of Evidence.

    As to the declaration of Special Agent Friehofer, the
Government argues that while hearsay generally is not admissible in
a motion for summary judgment, in an action for civil forfeiture,
some courts have found that the United States may meet its burden
of proof by presenting hearsay evidence that would normally be
inadmissable if the evidence is legally sufficient and reliable in
light of the aggregate facts (doc. 57, citing, among others, United
States v. One Parcel of Real Property Commonly Known as 901 N.E.

Lakewood, 780 F.Supp. 715 (D. Or. 1991)).  Further, the Government

contends that it may use both circumstantial evidence and hearsay

to show a substantial connection between property and the offense

and that the Court should evaluate the evidence presented with a

common-sense view to the realities of normal life (doc. 57, citing

United States v. $52,000, 508 F.Supp. 2d 1036, 1040 (S.D. Ala.

2007), quoting United States v. 3402 53rd St. W. Bradenton, FL, 178

Fed. Apps. 946, 947 (11th Cir. 2006)).

        The Government's position does not accurately reflect the

current state of the law.  It is true that normal summary judgment

procedures have not always applied to civil forfeiture proceedings.

In the past, the government in such proceedings had only to

demonstrate that it had probable cause to seize the property and,

as the cases cited by the Government demonstrate,[3] the government

could utilize inadmissible evidence, including hearsay evidence, to

establish probable cause.  See, e.g., United States v. One 56-Foot

Yacht Named Tahuna, 702 F.2d 1276, 1284 (9th Cir. 1983).  However,

the procedures for obtaining a civil forfeiture were changed with

CAFRA, the Civil Asset Forfeiture Reform Act of 2000, codified at

18 U.S.C. § 983, which evinced an intent by Congress to increase

the burden on the government when it seeks forfeiture.  See United

_____

        [3]  The cases cited by the Government predate CAFRA, with the
exception of United States v. 45 Poquito Road, 2006 WL 2233645
(D.Or. 2006) and United States v. $52,000, 508 F.Supp. 2d 1036,
1040 (S.D. Ala. 2007), which apply the pre-CAFRA procedure to a
post-CAFRA case and cite to pre-CAFRA cases for support.

States v. $174,206.00 in U.S. Currency, 320 F.3d 658, 662 (6th Cir. 2003). Prior to CAFRA, upon the government's probable cause showing, the burden shifted to the claimant to show, by a preponderance of the evidence, that the property was not acquired in violation of the law.[4] Id. CAFRA was intended to "level the playing field between the government and persons whose property has been seized" in order to prevent the forfeiture of property when the preponderance of the evidence shows it was not subject to forfeiture. Id.

With this increase in the Government's burden from probable cause to preponderance of the evidence, the relaxed pre-CAFRA evidentiary rules are no longer permissible. See, e.g., United States v. One 1973 Chevrolet Impala, 2009 WL 2423140 (W.D. Tenn. Aug. 7, 2009)(hearsay no longer appropriate for forfeiture order post-CAFRA); United States v. Six Negotiable Checks in Various Denominations Totaling One Hundred Ninety One Thousand Six Hundred Seventy One Dollars and Sixty Nine Cents ($191,671.69), 207 F.Supp.2d 677, 683 (E.D. Mich. 2002) ("[T]his elevated standard seemingly precludes any reliance on hearsay, as the Government could have done in a pre-CAFRA case."); United States v. .30 Acre Tract of Land, 425 F.Supp.2d 704, 708 n. 3 (M.D. N.C. 2006)

---

[4] With CAFRA, the burden does not then shift to the claimant as it did pre-CAFRA. The claimant may attack the government's evidence, or the claimant may in some cases present an innocent owner defense, but with CAFRA the government, not the claimant, is held to the higher preponderance standard.

("Additionally, the United States is no longer permitted to rely on hearsay evidence to meet its burden."); <u>United States v. One 1991 Chevrolet Corvette</u>, 390 F.Supp.2d 1059, 1065-66 (S.D. Ala. 2005); <u>United States v. One Parcel of Prop. Located at 2526 Faxon Ave.</u>, 145 F.Supp.2d 942, 950 (W.D. Tenn. 2001).[5]

For the foregoing reasons, the Government's arguments regarding the Claimant's Motion to Strike are not persuasive. However, the Claimant's arguments are similarly unpersuasive, as he merely asserts that Special Agent Friehofer's Declaration contains hearsay and that the co-conspirator exception does not apply (doc. 53, citing, <u>inter alia</u>, Fed.R.Evid. 801(d)(2)(E))). The Court agrees that 801(d)(2)(E) is not implicated by Special Agent Friehofer's Declaration. However, the Court finds that Special Agent Freihofer's Declaration in its entirety, including the statements of Baxter and Perry contained therein, may nonetheless be properly considered by this Court in its analysis of the Government's Motion for Summary Judgment because, to the extent it contains hearsay, such hearsay is admissible pursuant to the Federal Rules of Evidence 803(8). The majority of the statements

---

[5] At least one Court of Appeals has engaged in statutory interpretation to reach the same conclusion, that CAFRA signaled a change in the admissibility of hearsay and other evidence. The Fifth Circuit Court of Appeals found, through its analysis, that CAFRA requires that only admissible evidence be used to determine the merits of a forfeiture case. <u>United States v. $92,203.00 in U.S. Currency</u>, 537 F.3d 504, 509-10 (5th Cir. 2008). The Court finds the Fifth Circuit's analysis and rationale in that case both instructive and persuasive.

made in the Declaration appear to have been based on the Special Agent's personal knowledge, as required by Rule 56(e) of the Federal Rules of Civil Procedure, acquired through his undercover investigation of the pain clinics. Those statements not based on personal knowledge set forth factual findings resulting from an investigation made pursuant to authority granted by law, thus falling under the public records and reports exception to the hearsay rule of Rule 803(8)(C) of the Federal Rules of Evidence. Therefore, the Court finds that it may properly consider Special Agent Friehofer's Declaration in its entirety.

For the foregoing reasons, the Court DENIES Claimant's Motion to Strike (doc. 53).

### III.  Motion for Summary Judgment

#### A.  Summary Judgment Standard

Although a grant of summary judgment is not a substitute for trial, it is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; see also, e.g., Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464 (1962); LaPointe v. United Autoworkers Local 600, 8 F.3d 376, 378 (6th Cir.1993); Osborn v. Ashland County Bd. of Alcohol, Drug Addiction and Mental Health Servs., 979 F.2d 1131, 1133 (6th Cir.1992)(per

curiam).  In reviewing the instant motion, "this Court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Patton v. Bearden, 8 F.3d 343, 346 (6th Cir. 1993), quoting in part Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)(internal quotation marks omitted).

The process of moving for and evaluating a motion for summary judgment and the respective burdens it imposes upon the movant and the non-movant are well settled.  First, "a party seeking summary judgment ... bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of  material fact[.]" Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also LaPointe, 8 F.3d at 378; Guarino v. Brookfield Township Trustees, 980 F.2d 399, 405 (6th Cir. 1992); Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989).  The movant may do so by merely identifying that the non-moving party lacks evidence to support an essential element of its case.  See Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A., 12 F.3d 1382, 1389 (6th Cir. 1993).

Faced with such a motion, the non-movant, after completion of sufficient discovery, must submit evidence in support

of any material element of a claim or defense at issue in the
motion on which it would bear the burden of proof at trial, even if
the moving party has not submitted evidence to negate the existence
of that material fact. See Celotex, 477 U.S. 317; Anderson v.
Liberty Lobby, Inc., 477 U.S. 242 (1986). As the "requirement [of
the Rule] is that there be no genuine issue of material fact," an
"alleged factual dispute between the parties" as to some ancillary
matter "will not defeat an otherwise properly supported motion for
summary judgment." Anderson, 477 U.S. at 247-48 (emphasis added);
see generally Booker v. Brown & Williamson Tobacco Co., Inc., 879
F.2d 1304, 1310 (6th Cir. 1989). Furthermore, "[t]he mere
existence of a scintilla of evidence in support of the [non-
movant's] position will be insufficient; there must be evidence on
which the jury could reasonably find for the [non-movant]."
Anderson, 477 U.S. at 252; see also Gregory v. Hunt, 24 F.3d 781,
784 (6th Cir. 1994). Accordingly, the non-movant must present
"significant probative evidence" demonstrating that "there is [more
than] some metaphysical doubt as to the material facts" to survive
summary judgment and proceed to trial on the merits. Moore v.
Philip Morris Cos., Inc., 8 F.3d 335, 339-40 (6th Cir. 1993); see
also Celotex, 477 U.S. at 324; Guarino, 980 F.2d at 405.

Although the non-movant need not cite specific page
numbers of the record in support of its claims or defenses, "the
designated portions of the record must be presented with enough

specificity that the district court can readily identify the facts upon which the non-moving party relies." Guarino, 980 F.2d at 405, quoting Inter-Royal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir.1989)(internal quotation marks omitted). In contrast, mere conclusory allegations are patently insufficient to defeat a motion for summary judgment. See McDonald v. Union Camp Corp., 898 F .2d 1155, 1162 (6th Cir. 1990). The Court must view all submitted evidence, facts, and reasonable inferences in a light most favorable to the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970); United States v. Diebold, Inc., 369 U.S. 654 (1962). Furthermore, the district court may not weigh evidence or assess the credibility of witnesses in deciding the motion. See Adams v. Metiva, 31 F.3d 375, 378 (6th Cir. 1994).

Ultimately, the movant bears the burden of demonstrating that no material facts are in dispute. See Matsushita, 475 U.S. at 587. The fact that the non-moving party fails to respond to the motion does not lessen the burden on either the moving party or the Court to demonstrate that summary judgment is appropriate. See Guarino, 980 F.2d at 410; Carver v. Bunch, 946 F.2d 451, 454-55 (6th Cir. 1991).

### B. Civil Asset Forfeiture

Other than where specifically excepted by statute, the Government bears the burden in any civil forfeiture action of

proving by a preponderance of the evidence[6] that the property in question is subject to forfeiture. 18 U.S.C. § 983(c)(1); 18 U.S.C. § 983(i)(listing exceptions); United States v. One TRW, Model M14, 7.62 Caliber Rifle, 441 F.3d 416, 418 (6th Cir. 2006). The aggregation of facts, each one insufficient on its own, may suffice to meet the Government's burden. United States v. $67,220.00 in U.S. Currency, 957 F.2d 280, 284 (6th Cir. 1992).

Title 21 U.S.C. § 881(a)(6) provides in relevant part that all moneys "furnished by any person in exchange for a controlled substance...in violation of [the Controlled Substances Act and] all proceeds traceable to such an exchange" are subject to forfeiture. The Government alleges that Defendant 1 is proceeds of a violation of the Controlled Substances Act, 21 U.S.C. § 841(a)(1) (doc. 52).

Title 18 U.S.C. § 981(a)(1)(A) provides in relevant part that any personal property involved in a money laundering, or structuring, transaction or attempted transaction in violation of, inter alia, 18 U.S.C. § 1956, or any property traceable to such

---

[6] The burden of showing something by a preponderance of the evidence "simply requires the trier of fact 'to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence.'" Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust, 508 U.S. 602, 622 (1993) (quoting In re Winship, 397 U.S. 358, 371-72 (1970) (Harlan, J., concurring) (brackets in original) (internal citation omitted)).

property, is subject to forfeiture.  The Government's theory as to Defendant 3 is that it is money that was involved in financial transactions in violation of 18 U.S.C. § 1956(a)(1)(B)(i), which criminalizes conducting or attempting to conduct a financial transaction using property that represents the proceeds of some form of unlawful activity.  Because the Government is proceeding under a theory that Defendant 3 was used to facilitate or was involved in the commission of a crime, the Government must establish that there was a substantial connection between the Defendant and the violation.  <u>United States v. $118,170.00 in U.S. Currency</u>, 69 Fed. Appx. 714, 717 n.1 (6th Cir. 2003)(the "substantial connection" requirement of CAFRA applies only when the government proceeds under such a theory).

Therefore, to succeed in its Motion for Summary Judgment as to Defendant 1, the Government must adduce evidence such that a reasonable jury would find it more likely than not that it is proceeds of a controlled substances crime.  To succeed as to Defendant 3, the Government must adduce evidence such that a reasonable jury would find it more likely than not that Defendant 3 has a substantial connection to a financial transaction using money obtained from unlawful activity.

### C.  Defendant One

Defendant 1 consists of two parts: $1,200 found under Claimant's bed in six envelopes, each containing $200, with

different patient names written on the envelope; and $68,950 found in the shoe box in Claimant's brother's car (doc. 52).

The Government contends that Defendant 1 is proceeds of illegal drug trafficking from the pain clinics (Id.). It is undisputed that the $1,200 is money from the pain clinics (Id.; doc. 54). However, Claimant argues that he was not involved in illegal drug trafficking at the pain clinics, so money received for his services there does not fall within the ambit of the forfeiture statute (doc. 54). To support this argument, Claimant offers the fact that the Attorney General has not moved to suspend or revoke Claimant's DEA registration number, which, he asserts, the Attorney General would do if Claimant's actions at the pain clinics had been unlawful (Id.). In addition, Claimant maintains that he did not illegally dispense controlled substances without following proper medical procedures and argues that the Government offered no evidence of what "proper medical procedures" are (Id.). Claimant then points this Court to documents unsupported by affidavits that purport to both set forth proper medical procedures[7] and prove that

---

[7] These include pages from a DEA Practitioner's Manual, a page from the website of the American Medical Association listing principles of medical ethics, a copy of something called the Model Policy for the use of Controlled Substances for the Treatment of Pain from the Federation of State Medical Boards, an article entitled "Defining "Legitimate Medical Purpose'," an article entitled "Controlled Substances and Pain Management: Changes in Knowledge and Attitudes of State Medical Regulators," and an article entitled "COD=Cash-Only Doctors" (doc. 54).

Claimant followed these procedures[8] (Id.).  Regarding the balance of Defendant 1, Claimant argues that this money was earned either by his wife through her work as a nurse or by himself at River Downs (Id.).  Claimant questions why the Government has produced no photographic evidence of the shoe box and argues that the Government's failure to produce such pictures is proof that the shoe box money did not come from the pain clinics (Id.).  In addition, Claimant asserts that he and his wife had such a large amount of cash on hand because they were raised in the Depression era, and, he argues, "It is not uncommon for elderly folks to avoid keeping funds in banks for fear of loss with stock market crashes" (Id.).

Even viewing the record in the light most favorable to Claimant, the Court finds that the Government has produced evidence such that a reasonable jury could only find it more likely than not that Defendant 1 is proceeds of unlawful drug trafficking.  First, the indicia of unlawful activity at the pain clinics is notable individually and substantial in the aggregate: at least one of the clinics had an armed security guard, and Claimant kept a firearm in his desk drawer; patients were directed to certain pharmacies; only cash was accepted; long lines of people filled the clinics and the

_____

[8]  These include forms entitled "Patient Information," "Pain Analysis Questionnaire," "Medical Rehabilitation Center," "Pain Management Agreement," "Musculoskeletal Examination," and "Review of Efficacy of Therapy for Chronic Pain

parking lots; the clinics closed and relocated frequently; no medical personnel apart from the prescribing physicians were present; vital signs were not checked; every patient received the same prescriptions, regardless of presenting complaint; no follow up was done with any of the patients; if physical exams were performed, they were merely cursory; and patients could receive prescription refills ad infinitum. The documents to which Claimant points the Court in support of his argument that he did not engage in unlawful drug trafficking, that somehow his practice comported with the standard of care, are unsupported, unauthenticated and, therefore, inadmissible. See Alexander v. CareSource, 576 F.3d 551, 558 (6th Cir. 2009)(noting the court's repeated emphasis that unauthenticated documents do not meet the requirements of Rule 56(e) and citing, among others, Michigan Paytel Joint Venture v. City of Detroit, 287 F.3d 527, 532 n. 5 (6th Cir.2002); Meals v. City of Memphis, Tenn., 493 F.3d 720, 728-29 (6th Cir.2007)).[9]

Second, Claimant himself created the inference of the connection to the shoe box money and the pain clinics when he told the FBI during the course of their MRC investigation that he had

_____

[9] The Alexander court further explained, "The submissions by a party opposing a motion for summary judgment need not themselves be in a form that is admissible at trial...However, the party opposing summary judgment must show that she can make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary." Alexander, 576 F.3d at 558. Claimant simply has not met this standard.

another stash of cash at home, in a shoe box.  The fact that the shoe box was found in the trunk of Claimant's brother's car actually weighs against finding that money to be legitimate: the Claimant and his wife give conflicting testimony regarding why the shoe box was moved from the house to the car (doc. 55), and a large sum of cash in a shoe box in a bag, whether under the bed or in the trunk of a car, is suspect.  While "the existence of money or its method of storage are not enough to establish the property is subject to forfeiture" absent other evidence connecting the money to the unlawful activity, "possession of a large amount of cash is strong evidence that the money was furnished or intended to be furnished in return for drugs."  United States v. $118,170.00 in U.S. Currency, 69 Fed. Appx. 714, 717 (6th Cir. 2003), citing United States v. $506.231 in U.S. Currency, 125 F.3d 442, 452 (7th Cir. 1997), United States v. Currency, U.S. $42,500.00, 283 F.3d 977, 981 (9th Cir. 2002) (quoting United States v. $93,685.61 in U.S. Currency, 730 F.2d 571, 572 (9th Cir. 1984)).  Here, the large amount of cash in the shoe box was but one aspect of a larger context, which, in the aggregate, inevitably leads to the conclusion that Defendant 1 was proceeds of unlawful drug trafficking.

Claimant's explanation for the cash, that it is not unusual for "elderly folks" to keep cash out of fear of losing it in the stock market, does not withstand even minimal scrutiny: not

only is it contradicted by Claimant's own statement that the cash was in the car's trunk because they intended to place it in the stock market, but, more importantly, the record shows that Claimant was no stranger to the banking system (doc. 55). As the Government notes, at the time the instant action commenced, Claimant used six different banking institutions and had at least one on-line brokerage account (_Id_.). In addition, Claimant pleaded guilty to structuring, a crime that by its very nature requires some financial savvy and, minimally, conscious interactions with financial institutions.

Claimant's assertion that the money found in the shoe box was from legitimate sources (_i.e._, his wife's nursing earnings or his River Downs earnings) is not supported by the record. Claimant points the Court to his wife's testimony that she had been cashing her pay checks and putting some cash away each week and that, while some of the shoe box money might have come from the pain clinics, the "bulk of it" did not (doc. 54). Claimant also argues that his tax returns showing his River Downs earnings prove that the shoe box money was from a legitimate source (_Id_.). Claimant argues that a jury must decide what percentage of the shoe box money is pain clinic money and what is from legitimate sources because "[t]here is no way to specify exactly how much" comes from the pain clinics (_Id_.). Claimant simply does not create a genuine factual dispute with these assertions, however. He needed to have submitted

admissible evidence attacking the Government's case such that the Government couldn't meet its preponderance standard. Instead, Claimant offered "merely colorable and [] not significantly probative" evidence. See Anderson, 477 U.S. at 249-50. His unsupported assertions are simply not enough to survive summary judgment. See, e.g., United States v. Two Parcels in Russell County, 92 F.3d 1123, 1129 (11th Cir. 1996); United States v. Real Property at 40 Clark Road, 52 F. Supp. 2d 254, 268 (D. Mass. 1999)(claimant must offer something more than evidence of some legitimate income to create material issue of fact).

Finally, Claimant's reliance on the Attorney General's failure to revoke Claimant's DEA license and the lack of photographs of the shoe box is misplaced. Neither of these creates a genuine issue of material fact regarding whether Defendant 1 is proceeds of unlawful drug trafficking.

The Court finds that the only reasonable inference to be made here is that it is more likely than not that Defendant 1 is proceeds of the unlawful distribution of prescription drugs. Thus, as to Defendant 1, the Court GRANTS the Government's Motion for Summary Judgment.

### D. Defendant Three

The Government argues that Defendant 3, the contents of the Huntington Account, is subject to forfeiture both under a money laundering theory pursuant to 18 U.S.C. § 981(a)(1)(A) and a

proceeds-of-drug-trafficking theory pursuant to 21 U.S.C. § 881(a)(6) (doc. 55). Essentially, the Government contends that Claimant conducted a financial transaction with knowledge that the money was proceeds of drug trafficking and/or structuring and that the transaction was designed to conceal the unlawful nature of those proceeds (Id.). Specifically, the Government notes that Claimant admitted to having structured proceeds of $16,000 into his Ameritrade account on May 15, 2001, and the records of the Huntington Account show that it was opened with a check drawn on the Ameritrade account (Id.). Therefore, the Government contends that Defendant 3, the Huntington Account, was created with proceeds of an account, the Ameritrade account, that was used to structure revenue in violation of the law (Id.). As such, the Government argues, the Huntington Account is subject to forfeiture (Id.).

In response, Claimant contends that, while he admitted in his plea agreement that $16,000 in structured funds was deposited into what is now the Huntington Account, he did not admit that the money came from the pain clinics (doc. 54). In addition, he argues that the Government is not entitled to the other monies in the Huntington Account because those monies were not used to conceal the $16,000 since the additional deposits were open and public and no third parties were used to conceal the real owner (Id.). Finally, Claimant argues that when illegal drug proceeds are commingled with legitimate money, only the drug proceeds are

subject to forfeit (<u>Id</u>., citing to, among others, <u>U.S. v. Pole No. 3172, Hopkinton</u>, 852 F.2d 636 (1st Cir. 1988)).

The Government argues that an inference that the $16,000 is derived from legitimate sources, such as River Downs, savings over time, Claimant's wife's nursing salary or other funds, would be unreasonable given the record (docs. 52 and 55). Regarding River Downs, for example, the Government notes that Claimant received his lump-sum payment for the time in question months after the Huntington Account was opened, so the account could not have been opened with River Downs money (doc. 55). In addition, the Government argues that, to the extent any monies in the Huntington Account derive from legitimate sources, such monies were used to conceal the $16,000 derived from the drug trafficking, which means the entirety of the Huntington Account is subject to forfeiture (<u>Id</u>.).

The Court finds the Government's arguments well-taken. For the reasons discussed above with respect to Defendant 1, Claimant has not succeeded in presenting a genuine issue of material fact with respect to the legitimacy of the income that comprises Defendants. However, even if some portion of Defendant 3 was derived from legitimate sources, it could still be subject to forfeiture in its entirety. Claimant leaves unchallenged the Government's theory that Defendant 3 is subject to forfeit under a money laundering theory. Instead, Claimant supports his argument

that he is entitled to any legitimate monies only with cases relating to the forfeiture of property under a drug proceeds theory (doc. 54). The Court need not decide whether, under a drug proceeds theory only, the entirety of Defendant 3 would be subject to forfeiture even if some of the contents of Defendant 3 are from legitimate sources of income because, under a money laundering theory, when illegitimate funds are commingled with legitimate money both are subject to forfeiture if the legitimate money was involved in the offense. See, e.g., United States v. McGualey, 279 F.3d 62 (1st Cir. 2002); United States v. Baker, 227 F.3d 955, 970 (7th Cir. 2000).

Here, assuming any of the Huntington Account is derived from legitimate sources, the only reasonable inference to be made is that is was used to conceal the illegitimately gained income. Claimant admitted to having structured proceeds of $16,000 into the Ameritrade account in May of 2001, and the record shows that the Huntington Account was opened in June of that year with a check drawn on the Ameritrade account. This was a financial transaction with proceeds derived from the unlawful activity of the pain clinics, and Claimant knew of that transaction. Thus, the first two elements of concealment are met. See, e.g., United States v. Reed, 264 F.3d 640, 650 (6th Cir. 2001), citing 18 U.S.C. § 1956(a)(1)(B)(i).

With respect to the third and final element, the intent

to disguise or conceal, the Court looks to the evidentiary guidance provided in United States v. Marshall, 248 F.3d 525, 539 (6th Cir. 2001). There, the court noted that various types of evidence have been used to prove the intent to conceal, including, inter alia, "statements by a defendant probative of intent to conceal; unusual secrecy surrounding the transaction; structuring the transaction in a way to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features of the transaction; using third parties to conceal the real owner; a series of unusual financial moves cumulating in the transaction; or expert testimony on practices of criminals." Id., quoting United States v. Garcia-Emanuel, 14 F.3d 1469, 1475-76 (10th Cir. 1994). Here, Claimant pleaded guilty to structuring funds and admitted to structuring funds into an account that was, a short time later, used to open Defendant 3. Additionally, Claimant admitted that he structured these funds in order to avoid reporting requirements. These statements are probative of an intent to conceal and also indicate structuring the transaction in a way to avoid attention. Although Claimant is correct that the record does not show that a third party was used to conceal the transactions or that the additional deposits into the Huntington Account were not "open and public," these facts are certainly not dispositive, nor do they create a genuine dispute as to whether Claimant had an intent to conceal the illegitimate monies.

The Government has adduced evidence such that no genuine issue of material facts exists with respect to whether Claimant conducted financial transactions that involved the proceeds of drug trafficking, with the requisite knowledge that the monies were such proceeds and with the requisite intent to conceal the nature of such proceeds.  The only reasonable inference that can be drawn from the record is that Defendant 3 is substantially connected to the unlawful activities of drug trafficking and money laundering and that, to the extent any portion of Defendant 3 was legitimate, it was used to conceal the illegitimate monies.  Consequently, the Government's Motion for Summary Judgment as to Defendant 3 is GRANTED.

**V. Conclusion**

Having reviewed this matter, the Court finds that the evidence introduced by the Government is not inadmissible hearsay and that the Government has adduced evidence sufficient to meet the preponderance standard such that no genuine issue of material facts exists regarding whether Defendant 1 and Defendant 3 are subject to forfeiture.  Accordingly, the Court DENIES Defendant's Motion to Strike (doc. 57) and GRANTS the Government's Motion for Summary Judgment (doc. 52).

SO ORDERED.

Dated: October 27, 2009       /s/ S. Arthur Spiegel
                                 S. Arthur Spiegel
                                 United States Senior District Judge